Thomas S. MAIETTA and Maietta
Construction Company, Inc.

v.

INTERNATIONAL
HARVESTER COMPANY.

Supreme Judicial Court of Maine.

Argued June 14, 1985.

Decided July 19, 1985.

Kelly, Remmel & Zimmerman, Graydon G. Stevens, (orally), Barry Zimmerman, John N. Kelly, Portland, for plaintiff.

Hunt, Thompson & Bowie, Roy E. Thompson, (orally), Glenn H. Robinson, Mark V. Franco, Daniel R. Mawhinney, Portland, for defendant.

Before NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

WATHEN, Justice.

Defendant, International Harvester Company ("IH"), appeals from judgments of the Superior Court (Cumberland County) entered on jury verdicts in favor of Thomas Maietta and Maietta Construction Company, Inc. ("MC"). The suits result from three accidents involving two dump trucks sold by IH to MC. Defendant seeks reversal based on alleged errors in procedure, admission of evidence, and instructions to the jury. We find no error and deny the appeal.

This case arises from the consolidation of separate actions sounding in negligence and breach of express and implied warranty brought against IH by Thomas Maietta and MC. MC is a construction company located in Scarborough. Louis Maietta, Sr. is the president and half-owner of the company. The MC action, sought property damages and lost profits and revenues, arising from three accidents, involving three different drivers and two different trucks. Thomas Maietta, an employee of MC, was the driver during one of the accidents. By separate action, he sought damages for personal injuries allegedly suffered in the accident.

The trucks were manufactured by IH, and sold new by IH to MC in 1976. On April 30, 1976, MC bought a Model F5070 (the "5070") truck from IH's Portland dealer.[1] MC bought a Model F2070 (the "2070") truck from the same dealer on August 23, 1976. Both trucks were 10 wheel dump trucks, and both trucks were fitted with computerized braking devices, called 121 anti-locking devices, produced by Kelsey-Hayes. The 121 system was developed in response to federal regulations requiring trucks to be able to stop within a certain distance and within a certain path. The 121 system is designed to prevent skidding. The system includes a computer or controller that monitors the speed of a particular wheel and is capable of determining when a wheel is about to lock. At the point when a wheel is about to lock an electrical signal is sent to the brakes for that wheel, interrupting the flow of air to those brakes.

Both the 5070 and 2070 truck had a yellow light on the dashboard which when lighted, indicated a malfunction in the computer system (but no loss of non-computer

---

1. Apparently, in October of 1977, the IH factory branch in Portland became an independent dealer called Down East International. As the parties do not treat this change as significant, we will refer to the employees of the Portland dealership as IH employees.

controlled braking), according to IH mechanics. Louis Maietta, Sr. and Melvin Densmore, the IH mechanic who worked on the brakes of the 5070 and the 2070, both testified that the yellow light was often lighted, at least on the 2070. Louis Maietta, Sr. testified that although MC employed its own mechanics at its garage, only IH mechanics ever worked on the braking systems of the 5070 and the 2070. Apparently, Densmore did most of the brake work on the trucks for IH. MC kept no internal records with respect to maintenance and followed no written maintenance schedule. Nor did MC have a company policy requiring employees to read operator's manuals. In addition, MC did not keep daily records of equipment use.

The first accident took place on March 2, 1977 while Vincent Maietta was driving the 5070 in Gorham. Vincent testified that when he tried to slow the truck by applying the brakes, "all of a sudden there weren't any brakes." To avoid hitting an oil truck, he headed to the right side of the road, downshifting in an attempt to slow the truck. The truck hit a utility pole and turned over on its side. Louis Maietta, Sr. testified that the truck was out of operation for 28 days.

The plaintiffs' expert, George Ternent, concluded that the most probable area of malfunction causing the March 2 accident was in the computer itself. Defendant's expert, Gary Whitcomb, testified that the cause of the March 2 accident was unrelated "to any failure of the brake system in which there is any direct evidence." A Gorham Police Officer, investigating at the scene of the accident, testified that he asked Vincent if any equipment failure caused the accident, and Vincent answered in the negative.

The second accident took place on August 16, 1977 in Saco while Louis Maietta, Jr. was driving the 2070. When he approached a stop sign and stepped on the brake in the process of downshifting, "there was nothing," no brakes. To avoid crossing four lanes of traffic on Route 1,

Louis Maietta, Jr. steered to the right hitting the rear of a car. The truck stopped against the curb. Louis Maietta, Jr. then dumped the load from the truck and drove to MC's garage and from there to IH. The brakes seemed to function properly after the load was released. The 2070 was out of operation for 29 days after this accident according to Louis Maietta, Sr.

Louis Maietta, Jr. testified that August 16 was the second time that the 2070 completely lost braking power. Densmore confirmed Louis Maietta, Jr.'s allegation concerning the pre-August 16 loss of brakes.

Ternent concluded that the August 16 accident was caused by a failure in the controller (computer) of the anti-locking system. Ternent agreed, however, that the truck's brakes themselves were in very poor condition, well below par. Whitcomb, an expert offered by the defense, testified that the accident was the result of a loss of braking caused by improper maintenance of the basic braking system. Densmore attributed the poor condition of the air brakes to a malfunction in the front wheel self-adjusting mechanism.

The third accident occurred on August 25, 1977 while Thomas Maietta was driving the 5070 in South Portland. In preparation for making a turn, Thomas tapped the brakes to slow down. Thomas testified that he felt a pulling sensation to the right. According to Thomas, as the truck was going around the corner, the wheels would not straighten. The truck ran off the road, down a banking, and rolled over on its side. The 5070 was out of operation for 79 days following the August 25 accident, according to Louis Maietta, Sr. Thomas claimed that he suffered physical injuries in the accident.

After the accident, the 5070 was towed to MC's shop. The right front wheel was removed in the presence of Louis Maietta, Sr., and Tony Pasqual and Lewellyn Griffith from IH. Densmore, an IH mechanic, removed the wheel. An examination of the backing plate revealed that several nuts and bolts designed to hold the braking sys-

tem on the wheel were missing or loose. Out of the seven or eight sets of nuts and bolts, one set was missing completely. Two sets were tight. The remaining sets were loose. In addition, the holes through which the bolts were inserted were elongated. Based on this fact, Densmore testified that he concluded that the "looseness" had existed for "six months, a year." Further, Densmore testified that from observations he made of the wheel, he did not believe that the wheel had ever before been removed.

In Ternent's opinion, the August 25 accident was the result of a manufacturing defect, specifically that the bolts were not properly tightened. The Court prohibited Whitcomb from testifying as to his opinion on the cause of the accident. According to an offer of proof, Whitcomb would have testified that driver inattention caused the accident. On cross-examination, Whitcomb admitted that IH's assembly card indicates that no one "signed off" as having tightened the bolts on the right front wheel. But Whitcomb also gave testimony suggesting that markings on the assembly card indicated that the bolts were tightened at the factory.

With respect to MC's complaint, IH moved to sever those separate counts of the complaint arising from the March 2, August 16, and August 25 accidents. Defendant's motion to sever was denied in a pretrial order. In addition, the pretrial order consolidated the complaints of Thomas Maietta and MC for purposes of trial.

At trial, MC sought to prove that the March 2 accident involving the 5070 and the August 16 accident involving the 2070 were caused by defective computer braking systems installed in the two trucks. Both Thomas Maietta and MC sought to prove that the August 25 accident involving the 5070 was caused by a defect in the manufacture of the right front wheel assembly. The jury returned verdicts in favor of Thomas Maietta and MC.

## I. Procedural Objections

(A) Denial of severance and order for consolidation.

Defendant contends not only that Thomas Maietta's personal injury complaint should not have been consolidated for trial with MC's complaint for property damage, but also that the claims made in MC's complaint based on the three distinct accidents should have been severed from each other as well. Defendant asserts that the Court's ruling on these matters constitute reversible error because the rulings resulted in confusion and in extreme prejudice to the defendant, ultimately denying the defendant its constitutional right to a fair trial.

■ Rule 42(b), M.R.Civ.P., provides that for the sake of convenience and to avoid prejudice, a court may order separate trials of separate issues or claims. In *Thornton v. Cressey*, 413 A.2d 540, 544 n. 3 (Me. 1980), this Court recognized the exceptional nature of a separate trial order. *See* 1 Field, McKusick & Wroth, *Maine Civil Practice* § 42.5 at 587–588 (2d ed. 1970) ("Separation ... is not reversible except for clear abuse of discretion"). In *Thornton*, this Court listed five factors that militated against an order of separation: 1) substantial identity of the parties, and the witnesses, 2) overlapping evidence, 3) relatively simple issues, 4) relative times required for litigating different issues, and 5) the absence of discernable prejudice to the parties. *See id* at 545.

■ Each of the property damage claims alleged a failure of brakes, and the principal witnesses on liability and damages were the same for each of the accidents. There was evidence that the design of the trucks was substantially identical in all relevant aspects, even if their condition and repair histories were different.

■ With regard to the consolidation of the personal injury claim with the property damage claims, M.R.Civ.P. 42(a) provides, in part: "When actions involving a common question of law or fact are pending before

the court ... it may order a joint hearing or trial." Defendant concedes that the power to order consolidation is within the Court's discretion. *See* 1 Field, McKusick & Wroth, *Maine Civil Practice* § 42.3 at 586 (order of consolidation will be set aside only for abuse of discretion).

■ Common parties are not required for consolidation; "there needs to be only a common question of law or fact." *See id.* The common questions in this case concern the defectiveness of the right front wheel of the 5070 and how any such defectiveness may have contributed to the August 25 accident. The plaintiff and the damages claimed are different, however the liability issues are the same. Defendant contends that the jury was likely influenced by Thomas Maietta's personal injuries in finding liability. The injuries claimed by Thomas Maietta were neither dramatic nor likely to inflame the jury.[2]

We conclude that the Superior Court did not abuse its discretion in refusing to sever the three claims for property damage, nor did it commit any such abuse in consolidating Thomas Maietta's personal injury action.

(B) Jury confusion and inconsistency.

■ In furtherance of its argument that it was prejudiced by the joint trial, and also as a separate basis for a new trial, defendant argues that the jurors' responses to the verdict form demonstrate confusion and inconsistency. The jury found that defendant was guilty of negligence with respect to each of the three accidents. Similarly, the jury found a breach of both an implied warranty and an express warranty with regard to each accident. In addition, the jury found that MC was guilty of contributory negligence that was a proximate cause of the March 2, and August 25 accidents and made a deduction from the total award pursuant to the comparative negligence statute, 14 M.R.S.A. § 156 (1980). On the warranty theory, the jury found that MC was not guilty of fault that was a proximate cause of the March 2, August 16, or August 25 accidents.[3] From these answers on the jury form, the defendant deduces confusion.

The answers contained in the verdict form, however, are perfectly consistent with the instructions given by the presiding Justice. He instructed the jury that contributory negligence is not a defense to the warranty claims, but that if the plaintiffs proceeded voluntarily and unreasonably to encounter a known risk, a defense to the warranty counts would be made out and the comparative negligence law would apply. · Because no fault was found on the part of either plaintiff, we are not called upon to consider the validity of the instruction.[4] It is sufficient to note that we find no evidence of confusion or inconsistency.

2. Plaintiff Thomas Maietta claimed to have suffered a back injury, one that did not affect his appearance.

3. The jury found that Thomas Maietta was not guilty of negligence or fault in connection with his individual claims.

4. Presumably the presiding Justice considered the warranty claims to be similar to a strict liability claim. In *Austin v. Raybestos-Manhattan*, 471 A.2d 280, 286 (Me.1984), we held that in a strict liability action mere failure to discover the defect in a product does not constitute a defense. On the other hand, we found that voluntarily and unreasonably proceeding to encounter a known danger does constitute a defense. *See id.* In *Austin,* we concluded further that "section 156 [the comparative negligence law] is applicable to plaintiffs' strict liability claim, to the extent of requiring comparison of defendant's fault, if any, under section 221 [14 M.R.S.A. § 221 (1980), Defective or Unreasonably dangerous goods] with Blaine Austin's fault, if any, consisting in voluntarily and unreasonably proceeding to encounter a danger known to him." *See id* at 288. We offer no opinion whether a warranty claim falls within the provisions of 14 M.R.S.A. § 156 that refer to acts on the part of a defendant giving rise to liability in tort. *Cf. Ouellette v. Sturm, Ruger & Co. Inc.,* 466 A.2d 478, 483 (Me.1983) ("The non-contractual [warranty] liability resulting from the [statutory] elimination of privity and premised upon a status measured by reasonable foreseeability sounds in tort rather than in contract").

## II.   Evidentiary Objections

**(A) Permitting plaintiffs' expert to testify as to the causes of the March 2 and August 16 accidents.**

Prior to trial, defendant filed a motion *in limine* requesting that plaintiffs' expert on braking systems, George Ternent, be prohibited from testifying that: 1) IH negligently designed or manufactured the braking systems on the 5070 and the 2070, 2) Kelsey Hayes negligently designed the 121 anti-locking brake system, and 3) the March 2 and August 16 accidents were caused by a malfunction in the 121 anti-locking device installed on the 5070 and the 2070. The motion followed a lengthy deposition taken of Ternent by the defense. The defendant argues now, and argued to the Court below, that Ternent "did not possess the requisite factual basis to render the opinions outlined in the Motion and in fact based his opinions upon 'surmise and conjecture.'" The Court denied the motion on the theory that the objection went to the weight of the testimony rather than its admissibility.

Defendant does not dispute that Ternent is an expert in heavy truck braking design. Indeed, Ternent has impressive qualifications, including serving as chief engineer in the truck air brake manufacturing division at Bendix Westinghouse Corporation during the period when Bendix began to test a computerized anti-locking braking system. He retired from Bendix in 1976 and became a consultant, specializing in heavy truck braking system design. He has investigated other accidents involving alleged failures of computer anti-locking systems.

Notwithstanding Ternent's experience at Bendix, however, the defendant contends that Ternent should not have been permitted to testify about the computerized braking systems in the 5070 and the 2070. As the defendant points out, Ternent never inspected the computer braking systems actually in place in the two trucks, nor has he examined the electronic components of any Kelsey Hayes 121 system. Ternent admitted that he did not know the circuitry of the computer system. All parties agree that Ternent used a process of elimination to reach his conclusion that the computer braking system caused the March 2 and August 16 accidents.

In short, Ternent relied on the testimony of the drivers that they had no brakes, he relied on the testimony of Densmore that the underlying air braking system was in working order, and he relied on what he knew about the general design and history of computerized anti-locking braking systems. Because nothing was wrong with the air brake system itself, Ternent concluded that the most probable cause of the accident was in the electronically controlled anti-locking system. He was not, however, able to pinpoint where the specific failure in the system occurred, although, again by process of elimination, he believed the most likely culprit was the electronic circuitry of the computer.

■ Defendant focuses on a portion of Ternent's deposition testimony in which he stated his opinion that "the design of the anti-lock system produced what I would want to call a defective product." At trial during his voir dire, Ternent agreed that in his opinion, expressed at his deposition, the defect in computer controlled anti-locking brake devices is in taking away from the driver control over the release of the brakes. The defendant points out that Ternent admitted in his deposition that there was no design standard in the trade to support his theory of negligent design. From this absence of support, the defendant concludes that Ternent's testimony should have been excluded because it did not comport with the practice of experts when not testifying. *See McLellan v. Morrison,* 434 A.2d 28, 30 (Me.1981) (expert opinion excluded in certain circumstances where basis of opinion in inadmissible); *see also* M.R.Evid. 705(b) (expert must possess a sufficient basis for his opinion).

■ We find that the requirements for admissibility of an expert's opinion were met in Ternent's case. The facts upon

which Ternent's opinion was based were of a type permitted by M.R.Evid. 703. An expert may rely on facts or data "perceived by him or made known to him at or before the hearing. If of a type relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." *See* M.R.Evid. 703. Ternent relied upon the testimony of the drivers and Densmore, as well as, his own knowledge of air brakes and computerized anti-locking devices. His testimony was admissible at trial.[5]

(B) Permitting the plaintiffs' expert to testify as to the cause of the August 25 accident.

At his deposition, Ternent attributed the cause of the August 25 accident to "mechanical failure of the right front wheel." He stated the basis for his opinion as follows:

> [O]n the fact that all of the bolts were loose in the—that hold the brake backing plate on the steering spindle on the right hand front wheel, and this would permit cocking of the brake assembly to binding up the wheel.

He opined that the "cocking", referring to the braking plate being pulled away from the spindle toward the axle and hub, resulted in the high torque which pulled the truck to the right. At the end of the deposition, he stated that he planned further investigation to determine if something "other than cocking ... might explain lockup or severe retardation of that wheel." The following colloquy took place at the deposition:

> (Defense counsel): And depending upon the outcome of that study, that's an area of opinions that you may—I mean that's the area where you may come up with additional opinions? Is it fair to say that if he does come up with—

(Plaintiff's counsel): We will let you know.

(Defense counsel): I appreciate that, but I would appreciate also not only hearing that opinion, but an exhausted detail of how he arrived at the opinion so I can effectively conduct cross-examination at trial in the detail that I went in today.

The defendant now argues that Ternent was allowed to change his opinion in his trial testimony, despite the plaintiffs' failure to inform the defendant of any change in testimony. At trial, Ternent testified, as he did at his deposition, that the brake assembly on the right front wheel "cocked":

> My opinion is that the brake assembly had become loose on the steering spindle and there was a cocking action which multiplied the normal brake force and caused the right wheel to brake much more severely than the left wheel and pull the truck to the right.

Later, he testified that:

> It's my opinion that that very light brake application expanded the wedges, set the brakes lightly, and then as the drum rotated, and this entire assembly moved and mechanically cocked, mechanically cocked so that there was heavy interference between the lining and the brake drum and resulted in heavier braking on the right wheel while the left wheel of course was perfectly proper with eight bolts solidly tight while on the right wheel only two bolts were described as anywhere near tight. The implication being that they were not fully tightened, and that is my explanation of why that right front wheel pulled the truck off the road on August 25th.

On cross-examination, Ternent stated that he had changed his opinion regarding the "planing" of the "cocking", but he remained convinced that "cocking" caused the accident.

---

5. Although the witness offered no support for his opinion that computer anti-locking devices are defective because they reduce the driver's control of the brakes, he ultimately concluded that the cause of the accidents was most probably the computer device.

Defendant asserts that the change in testimony violated discovery and evidentiary rules, foreclosed effective cross-examination, and unfairly prejudiced his case. *See* M.R.Civ.P. 26(e)(1) and (2) (duty to disclose substance of expert's testimony and amendment thereof); M.R.Evid. 705.

Besides arguing that any change in testimony was minor because Ternent continued to testify that some variant of "cocking" caused the accident, plaintiffs contend that defendant failed to object in a timely fashion to the witnesses' testimony. Only after concluding cross-examination, which included an attack on his change of opinion from the time of the deposition, did defense counsel object on the basis of changed testimony. During direct examination, defense counsel objected in the following manner to the admissibility of Ternent's opinion on the cause of the August 25 accident: "Same objection, your honor." Tracing the "same" objection to its source, the objection could only logically refer to a prior objection to an anticipated "expression of an opinion based on industry wide experience with the 121 anti-locking system", or to a prior objection based on a lack of foundation. We conclude that defense counsel failed to preserve the objection that is now being pressed. The difference in testimony does not rise to the level of obvious error affecting substantial rights.

(C) Prohibiting defendant's expert from testifying as to the cause of the August 25 accident.

At trial defendant's expert on braking systems, Gary Whitcomb, was prepared to testify, after viewing the scene, that driver inattention was the cause of the August 25 accident. At his deposition, however, Whitcomb has testified that there · was insufficient evidence to form an opinion as to the cause of the accident. At the beginning of trial, the parties agreed and the Court ordered that the witness would be confined to the opinions expressed in his deposition because he had not been listed

as a witness in defendant's pre-trial memorandum and defendant had failed to respond to an interrogatory propounded pursuant to M.R.Civ.P. 26(b)(4). Defendant now ignores the procedural background and argues that because plaintiffs' expert was allowed to "change" his opinion, fairness required the admission of Whitcomb's changed opinion. We hold that the Court committed no error in rejecting defendant's argument or in excluding the witness's opinion testimony as a sanction for failure to comply with a discovery request. *See* M.R.Civ.P. 37(d).

(D) Admitting evidence of a recall of IH buses containing computer anti-locking devises.

Plaintiffs called Anthony Pasqual, the service manager at the IH dealership, and attempted to question him about plaintiffs' Exhibit # 33, an IH school bus recall. Defendant objected to this line of questioning on grounds of relevance and undue prejudice. The Court ruled that a proper foundation had not been laid by the plaintiffs, showing that the braking systems of the buses were identical to the systems on the 5070 and 2070. Defendant moved for a mistrial on the grounds of prejudice at the end of Pasqual's cross-examination; the Court denied the motion. Over defendant's objection, plaintiffs' Exhibit # 33 was later admitted, during plaintiffs' cross-examination of Lewellyn Griffith, IH's regional technical service manager.

Defendant objects to the admission of plaintiffs' Exhibit # 33 and questions concerning it on two grounds: 1) admission of the Exhibit violated the Pre-Trial Order, and 2) admission was permitted without proper foundation. The Pre-Trial Order provides that "all exhibits to be introduced at trial are as set forth in the Pre-Trial Memoranda." Plaintiffs' Exhibit # 33 was not listed in the plaintiffs' pre-trial memorandum. The plaintiffs advance three reasons for admitting the Exhibit despite noncompliance with the Pre-Trial Order: 1) the document came into the plaintiffs' posses-

sion only five days before trial, 2) the document is an IH business record so the defendant was not unfairly surprised, and 3) the document should have been produced in the course of discovery in response to the following production request, filed July 3, 1980:

> Copies of all records of recall campaigns conducted since January 1, 1975, by International Harvester or on its behalf, in relation to safety related brake defects.

■ The mere fact that the Exhibit was not listed in plaintiffs' Pre-Trial memorandum does not compel the presiding Justice to exclude the evidence. Given the confusion surrounding defendant's response to the discovery request and the fact that the Exhibit came from defendant's records, we find no abuse of discretion.

■ With respect to defendant's objection concerning the lack of foundation, the evidence of the school bus recall was relevant. The recall notice was dated August 1976. The notice stated that false cycling of computer anti-locking systems in school buses could result from "stop and go" school bus driving. The notice warned that the defect could cause loss of brakes without prior warning. Witnesses had testified that the school buses had basically the same 121 anti-locking systems as the 5070 and 2070 trucks, the major difference being the size of the bus braking systems and the possibility of vibration. Plaintiffs correctly contend that the recall evidence was admissible to bolster Ternent's opinion on the cause of the March 2 and August 16 accidents. Ternent testified that the computer malfunctioned and released the air brakes. On cross-examination, the defendant attempted to show that Ternent's opinion was the result of conjecture and was highly unlikely. The defendant brought out that the 121 anti-locking device contains a self-abort mechanism which was designed to permit driver control of the brakes within a certain period after the anti-locking system took control. On cross-examination, defense counsel's questioning suggested the improbability of a malfunction in both the anti-lock and abort devices. The school bus recall would tend to demonstrate that false cycling was possible, and that it could cause a crash despite the abort mechanism. We find no error in the Court's ruling.

(E) Excluding MC's tax returns.

To establish its claim for lost revenues, MC presented the testimony of its accountant. Relying on information given to him by Louis Maietta, Sr., the accountant testified that the net lost revenues due to the three accidents was $72,428. The calculation was made on the basis of lost work days, average number of trips per day, average yards of material per trip, average price of the material handled, and revenues from delivering and spreading the material at the job site. From the resulting figure, wages of the operators, stumpage fees, fuel costs, and estimated repair and maintenance costs were deducted.

Defendant proposed to cross-examine the accountant concerning information contained in MC's tax returns for 1976, 1977, and 1978 and to introduce those returns into evidence. The Court excluded the returns and questions concerning the returns. Defendant argues that the Court's ruling is reversible error.

Plaintiff MC relies on the case of *Orr v. Williams*, 379 S.W.2d 181 (Mo.App.1964) for the proposition that the proper measure of damages for the loss of use of the trucks is lost gross revenues minus the normal expenses directly attributable to the production of such revenues. Defendant does not challenge the use of lost revenues as the proper measure of damages. Defendant argues, however, that where a plaintiff claims lost earnings or profits, tax returns are admissible, either as admissions or for the purpose of impeachment. Defendant offered the tax returns for the stated purpose of permitting the jury to compare *taxable income* to the claimed damages. Defense counsel told the Court that:

> The Defendant intends to offer this evidence, your Honor, to show that the

amount of profit received by the corporation as evidenced on their tax returns is a much smaller percentage of gross sales than the Plaintiff is claiming in this suit ....

The Court explained to plaintiffs counsel:

We're not concerned with net profit. We're not concerned with taxable income. We're concerned with the lost revenue less the direct cost of producing that revenue that was lost .... We couldn't care less as to the taxable income of this corporation, the bottom line.

The issue is not whether tax returns per se are admissible, but whether MC's tax returns would have aided the jury in assessing the claimed damages. In making this determination, it is necessary to decide whether the defendant made clear the purpose for which the returns were offered, and if so, whether the returns were offered for a proper purpose.

Defendant originally offered the returns to show that the amount of profit claimed on the tax returns was a much smaller percentage of gross sales than what the plaintiff was claiming as damages. The tax returns have entries for gross receipts (or gross sales) and gross profit. After cross-examining the accountant about deductions of certain costs from gross sales figures, defense counsel explained to the Court that he had been trying to meet MC's objection "concerning whether or not the bottom line taxable income reflected any of these accidents here." The Court replied that "[t]axable income is not the test ...." Finally, defense counsel made an offer of proof in which he said:

The tax returns would show that the amount of profit that Maietta Construction Company or the profit upon which they're taxed is a small fraction of the figure that they intend to put up on the board here as their lost revenue or lost profits figure.

Still later defense counsel attempted to elicit testimony that taxable income in 1978 was about 3% of gross sales.

■ The conclusion is inescapable that defendant sought to introduce the tax returns for the purpose of comparing taxable income with gross sales or receipts. The Court committed no error in excluding the evidence for this purpose. Had defendants sought to introduce only the gross receipt and gross profit figures on the tax returns so that the ratio between those two figures could be compared to the ratio of claimed total lost revenues and claimed net lost revenues, the result might have been different.

### III. Objections to the Court's Instructions

(A) Jury instructions on breach of warranty and disclaimer.

■ Defendant objects to portions of the Court's instructions regarding the express warranty claim arising from defendant's written warranty. Although the Court instructed on this issue it found that "there is no evidence in the record as to when that written warranty was given to the Plaintiffs in this case," i.e., no evidence that the written warranty became a part of the basis of the bargain. On the facts of this case, the express warranty could be based only on the written warranty. Therefore, there is no evidence that any express warranty became part of the basis of the bargain. Any error in instructing on express warranty was harmless error because the jury expressly found that the defendant breached implied warranties of merchantability.

(B) Jury instructions that IH had a duty to test for latent defects.

Defendant contends that the evidence did not generate or support the following instructions given by the Court:

The manufacturer has an affirmative duty to make reasonable tests and inspections as are necessary to discover latent defects or hazards in the product made. No manufacturer is required to make an accident proof product. Instead

our law imposes a duty upon the manufacturer to exercise reasonable care.

In determining whether a manufacturer has exercised reasonable care in the design of its product, it is to be held to the degree of knowledge and skill of experts. This standard imposes upon the manufacturer the duty of an expert to keep abreast and informed of the development in its field including safety devices and equipment used in its industry for the type of produce it manufactures.

■ Defendant does not object to the instructions, as such, but rather defendant questions whether the evidence justified instructions on these matters. The evidence of the defectiveness of the right front wheel of the 5070 truck involved in the August 25 accident, supports the instruction on duty to inspect for latent defects.

■ With respect to the manufacturer's duty to keep informed, there was sufficient evidence to generate that instruction. Defendant's expert, Whitcomb, admitted that the system had "severe problems" when it was first put on the market in 1975, although he did not specify the types of problems. Louis Maietta, Sr., testified that defendant's mechanic, Densmore, told him that "nobody really knows much about fixing them [the truck braking system]."

The remaining issues raised by defendant are lacking in merit and require no discussion.

The entry is:

Judgments affirmed.

All concurring.