MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2019 ME 165
Docket:        Yor-19-213
Submitted
  On Briefs:   November 21, 2019
Decided:       December 12, 2019

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, JABAR, HJELM, and HUMPHREY, JJ.


IN RE CHILD OF REBECCA R.


PER CURIAM

[¶1]  A mother and father appeal from a judgment of the District Court (Biddeford, *Duddy, J.*) terminating their parental rights to their child pursuant to 22 M.R.S. § 4055(1)(A)(1)(a), (B)(2)(a), (B)(2)(b)(i)-(ii), (iv) (2018).  The parents contend that the court erred in finding by clear and convincing evidence that each of them is unfit. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii), (iv). The mother additionally contends that the court violated her constitutional rights to due process and equal protection by terminating her parental rights "based solely on [her] economic status."  The father separately contends that the court erred in (1) finding by clear and convincing evidence that termination was in the child's best interest, *see* 22 M.R.S. § 4055(1)(B)(2)(a); (2) declining to allow a witness who testified at the hearing to testify as an expert; and

2

(3) failing to accommodate his disability at the hearing. We affirm the judgment.[1]

A.    Unfitness and Best Interest Findings

[¶2]   The court made its unfitness findings, as well as its finding that termination was in the child's best interest, based on competent evidence in the record. "We review the court's factual findings supporting its determination of parental unfitness and best interest[] of the child[] for clear error, and review its ultimate conclusion that termination is in the best interest[] of the child[] for an abuse of discretion, viewing the facts, and the weight to be given them, through the trial court's lens, and giving the court's judgment substantial deference." *In re Children of Jessica D.*, 2019 ME 70, ¶ 4, 208 A.3d 363 (quotation marks omitted).

[¶3]   The court's supported, thorough factual findings underlying its unfitness and best interest determinations include the following:

> This is a deeply frustrating and somewhat odd case. [The father and mother] are the biological parents of [the three-year-old child]. [The child's] parents do not suffer from domestic violence or substance use disorder. Jeopardy in this case should have been easily rectifiable. Instead, over the course of nearly three years [the father and mother] selfishly elevated their own lifestyle choices over the needs of [the child], stubbornly refused to engage in key aspects

---

[1]   We also affirm, without further discussion, the trial court's order denying the mother's M.R. Civ. P. 60(b)(6) motion for relief from the judgment. We previously ordered that the mother's appeal from that order be consolidated with this matter.

of the reunification plan, and persistently failed to alleviate lack of safe and stable housing, which was a critical element of jeopardy. As a result of their actions, [the child] has remained in foster care for most of her young life. . . .

. . . .

. . . The Court finds by clear and convincing evidence that the Department has made reasonable efforts to rehabilitate and reunify the family, and has made reasonable efforts to identify and pursue an alternative permanency plan. . . .

The Court finds the following facts by clear and convincing evidence. . . . Within days of [the child's] birth, [hospital] staff reported concerns regarding [the child's] parents to the Department due to the mother's untreated mental health and difficulty managing [the child's] care, and the father's lack of engagement with the infant. As a result, the Department opened an assessment of the family. [The child] was discharged from [the hospital] . . . to the care of her parents with a Department Safety Plan in place requiring the mother be supervised at all times with [the child].

[Eight months later], another report was made to the Department with concerns for [the child] and her parents. [The parents] had left [the] eight month old [child] in the care of two individuals they had just met at a grocery store. These two individuals were not safe or appropriate caregivers for [the child]. One of the individuals had significant cognitive limitations. The other individual had child protective history and had lost the custody of her own children. [The parents] left [the child] in their care for approximately one month, allegedly because where they were living had become infested with bed bugs. Neither [parent] recognized the risk of their judgment and decision to leave [the child] with these individuals.

The Department requested and received an Order of Preliminary Child Protection granting custody of [the child] to the Department . . . . A Jeopardy Order as to both parents was [later]

entered by agreement of the parties . . . with custody of [the child] remaining with the Department. By this point, [the parents] had been evicted from their housing and were homeless. . . .

The Jeopardy Order set forth several required steps . . . . Both parents were required to participate in parenting education. [The mother] was required to consistently engage in mental health treatment and follow recommendations. [The father] was to participate in a mental health evaluation and follow the resulting recommendations. [The parents] for the most part complied with these requirements. However, both parents were also required to establish and maintain safe, stable housing suitable for family reunification. Toward this end, the parents were required to notify the Department and Guardian Ad Litem of any changes in the composition of their household, since one of the grounds for jeopardy was the parents' inability to recognize safe and appropriate caregivers for [the child]. [The parents] failed to satisfy these requirements.

. . . .

[The parents] initially participated in joint supervised visits through Home Counselors, Inc. (HCI) with [the child]. However, it soon became clear that [the father] was unable to participate meaningfully in morning visits with [the child]. This was the first indication the Department had that something was seriously amiss with [the father]. . . . The visit supervisor reported safety concerns due to [the father's] inability to care for [the child]. [The mother] did not appear to recognize the risk posed by [the father]. Both parents reported that [the father's] dysfunction was due to his sleep schedule and that he was up most of the night and slept during the day. The visits were suspended in order to have a Family Team Meeting to address the visit supervisor's concerns. . . . [T]he issues created by [the father's] self-imposed total and shocking inability to function throughout the morning and into the early afternoon— enabled by [the mother]— . . . became a major concern as the case moved along.

As of May 2017, the parents had failed to make sufficient progress toward reunification and the Department filed a Petition for Termination of Parental Rights. Both parents had started mental health services, but neither parent could acknowledge the reasons why [the child] had come into foster care or acknowledge the risk of [the father's] behavior at visits. The parents had yet to participate in parenting education. The parents were residing in a home provided by their Church but the caseworker was receiving reports of unsafe individuals being in the home. Despite filing the Petition, the Department continued with the concurrent plan of reunification.

In the summer of 2017, the visit supervisor continued to report [the father's] inability to participate appropriately in morning visits. . . . [T]he caseworker . . . observed a supervised visit with [the father] while [the mother] was absent due to illness. [The father] was thoroughly nonfunctional during the visit and unable to parent [the child]. . . . [The father] continued to be unable to function or interact with [the child] at morning sessions. His behavior during morning sessions did not reflect someone who was merely tired from staying up late, but was extreme, disturbing and frightful. [Footnote omitted.] [The father] needed support to even stand and walk. [The social worker] reported that [the child] continued to be afraid of her father.

. . . .

. . . [T]he Department agreed to pay for a sleep consultation for [the father] as the parents maintained that [the father] suffered from a sleep disorder.

[The father] participated in a sleep consultation with [a neurologist]. . . . [The neurologist] diagnosed [the father] with a "circadian shift condition," an easily curable sleep pattern akin to jet lag. Circadian shift condition can be corrected in as little as four to five days, or gradually over two to three weeks. . . . According to [the neurologist], [the father] could easily correct his circadian rhythm, and make it consistent with a conventional nighttime sleep pattern, if he wanted to. However, [the father] reported that he was content

with his sleep pattern, and was not interested in changing it. . . . The Court accepts [the neurologist's] testimony in all respects, and finds as a matter of fact the narrative set forth above.

[The neurologist] recommended a follow-up visit with his office and possible mental health counseling. [The father] refused to comply with the recommendations.

. . . .

The Department caseworker . . . went to observe the parents' home in late June 2018 . . . . [The caseworker] observed the home to be in an unsafe and chaotic condition with boxes piled high and clutter covering all surfaces. For the first time, [the mother] informed [the caseworker] that there were two roommates living in the home. In April 2018, [the mother] had inexplicably invited two unknown individuals . . . to move into the home. [The parents] did not know the individuals beforehand, and [the mother] had only just met the individuals when she invited them to live with her and [the father]. Neither [parent] had reported the housing change as required by the Jeopardy Order and reunification plans. [The mother] learned soon thereafter that [one of the roommates] had child protective involvement regarding her own children and that [the other] had criminal history and neither individual was a safe or appropriate roommate.

. . . .

The parents appeared at Court for a Judicial Review in August 2018. [The father] could not walk independently or function in Court, due to his lack of a normal sleep cycle. [The father] had not participated in any follow-up services to address his sleep pattern. The parents had made no progress toward in-home visits or trial placements due to the decisions made by [the mother] and the parents' inability to rectify the home situation. It was approaching two years since [the child] came into the custody of the Department. With the support of the Guardian Ad Litem, the Department re-filed the Petition for Termination of Parental Rights . . . .

. . . The condition of the home through the summer and fall of 2018 deteriorated. The relationship with the roommates also deteriorated and resulted in destruction of personal property and police involvement. The roommates refused to leave the home, and became belligerent. [The father] was of little to no use because of his sleep pattern. He ultimately disengaged from the situation and stayed out of the home. [The mother] was left to try to manage the home situation, which she was not able to do. Ultimately, [their pastor] had to evict the roommates, but that did not occur until November 2018. [The mother] conceded that the home was not safe for [the child] to visit or reside in between April 2018 and late November 2018.

In addition to [the two roommates], [the parents] inexplicably continued to allow a series of other, unsafe individuals to reside in their home for varying lengths of time. . . .

Of signal importance, [the] Pastor . . . told [the father] sometime in July or August 2018, that he was facing foreclosure on the house they were living in. He explained that . . . they needed to find new housing, since they would not be able to stay in the house indefinitely, and they might need to move out in a matter of months. [The parents] claim they renewed their applications for low-income or subsidized housing, but had no success.

[The parents] were unable to secure housing by paying rent on their own, because their respective decisions not to work or to be underemployed left them essentially impoverished. But this inability to pay rent was self-inflicted, not the result of external factors or poverty. From the first Rehabilitation/Reunification Plans, [the parents] were instructed to establish safe and stable housing, and to prove financial self-sufficiency through employment, disability, or some other alternative means of income. During the case, [the mother] stabilized her mental health issues and became consistent with her medication management, and was thus mentally and physically able to work. She has no disability preventing her from working, and during the case she has had no

child at home to care for. Nevertheless, she chose not to work to earn income. At trial, she claimed that she is a full time student at an online university, and thus has no time to work. The Court is not persuaded by the testimony, but even if true, [the mother's] imprudent decision to forego employment and income during this critical phase of [the child's] life . . . was a significant contributor to [the mother] failing to secure safe and stable housing for [the child].

As to [the father], his choice to maintain an unorthodox sleep pattern meant that during the case he only worked part-time, low paying, late night jobs that did not interfere with his lifestyle. He worked only 20-25 hours per week, and did not earn enough income to be able to afford paying a commercially reasonable rent. But [the father] has no disability, and there is no reason why he could not work a decent-paying, full-time job. He just does not want to, because it would require him to change his sleep lifestyle. His decision in this regard, coupled with [the mother's] decision not to work at all, means that for the life of the case he has failed to secure safe and stable housing for [the child], even though there is no reason why he could not provide an appropriate home for her if he was willing to do so.

As of the date of the last trial day . . . [the parents] had been officially evicted from the Pastor's former house in which they had been living. [The mother] testified that her plan was to stay with a friend who had child protection involvement. [The mother] acknowledged that it would not be a safe and appropriate environment for [the child] to live [in] or visit, and that [the father] was not welcome there. [The mother] claimed she had a back-up opportunity that would be safe for [the child], but [she] was not pursing it. [The father] had no housing plan at all. So as the trial ended, both parents were homeless, unemployed or underemployed due to their own choices, without safe and stable housing, and with no plans whatsoever for obtaining safe and stable housing. Neither parent was or is willing to change their lifestyle so as to care for [the child]. Entirely due to their own lifestyle choices, [the parents] have made no progress on safe and stable housing for the two and a half years since the case began.

As of the date of the last hearing . . . [the child] had been in the care of the Department for two and [a] half years. [The child has] turned three . . . . Since coming into care . . . and thus for the majority of her life, [the child] has lived in the home of [the foster parents]. . . . [The foster parents] have provided safe and stable housing for [the child]. They have also provided consistent and loving care for [the child] and have met all of her needs.

. . . .

. . . [T]he Department has provided clear and convincing evidence, based on three out of the four termination grounds, that [the parents] are unfit . . . . These grounds include 1) an inability or unwillingness to protect the child from jeopardy within a time reasonably calculated to meet her needs; 2) an inability or unwillingness to take responsibility for the child within a time reasonably calculated to meet her needs; and 3) failure of the parents to make a good faith effort to rehabilitate and reunify with the child. [22 M.R.S. §] 4055(1)(B)(2)[(b)](i), (ii) & (iv).

. . . [T]he Court finds by clear and convincing evidence that termination of parental rights is in the best interest of [the child].

. . . .

This is not a case about poverty; it is a case about the parents' deliberate choices to put their own lifestyle preferences first, and disregard the needs of [the child]. . . . Under the circumstances, the Court is unwilling to provide the parents additional time. . . . This termination hearing was concluded two and [a] half year[s] after [the child] entered foster care. No more time is available for reunification because "once a child has been placed in foster care, a statutory clock begins ticking. In setting that clock, the Legislature has spoken in terms of days and months, rather than in years, as might better fit an adult's timeframe for permanent change."

> The Court finds that due to the selfish and ill-considered actions of her parents, [the child] has been forced to wait far too long and needs permanency now. She has been in a safe and stable placement that she considers home for two and [a] half years. She has thrived in the placement. The [foster parents] are willing to adopt her and [they] consider her a part of their family.

(Citation omitted.)

[¶4] We discern no clear error or abuse of discretion in the court's findings or analysis. *See In re Children of Jessica D.*, 2019 ME 70, ¶ 4, 208 A.3d 363.

B.     Mother's Constitutional Claims

[¶5] Beyond her unavailing argument that the court's unfitness finding was not supported by sufficient evidence, the mother asserts that her constitutional substantive due process and equal protection rights were violated when the court "terminated her parental rights based solely on her financial status, specifically her ability to finance a home."

[¶6] "Before we reach directly any constitutional issue, prudent appellate review requires that we first determine whether the issue may be resolved on a basis that does not implicate the constitution." *In re Christopher H.*, 2011 ME 13, ¶ 18, 12 A.3d 64 (quotation marks omitted). As set out above, the court based its finding that the mother was unfit on considerably more than the bare fact that she was unable to afford housing; the court was

primarily concerned with *why* she was unable to afford housing, namely her unwillingness to change her lifestyle for the child's benefit in order to do so. Furthermore, the court made extensive findings concerning the mother's choice to allow unsafe people access to the family home, a significant factor unrelated to financial issues, and it found the mother's testimony to the contrary to be not credible.

[¶7]    Given the supported factual findings underlying the court's unfitness determination, and given the court's explicit affirmation that "[t]his is not a case about poverty," we need not and do not reach the mother's constitutional argument because it is grounded in a faulty premise. *See id.*

C.    Expert Testimony

[¶8]    The parents' pastor testified at the hearing concerning his relationship with the parents as their pastor; their landlord; and, for a period of five weeks, their couples counselor.  The father contends that the trial court erred in declining to allow the pastor to testify as an expert concerning the parents' counseling, although the pastor was permitted to testify as a fact witness regarding the topics that he discussed with them.  We disagree.

[¶9]    Maine Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education

may testify in the form of an opinion or otherwise if such testimony will help the trier of fact to understand the evidence or to determine a fact in issue." "Expert testimony can be relevant only if it is reliable . . . ." *State v. Burbank*, 2019 ME 37, ¶ 8, 204 A.3d 851.

[¶10]  Ordinarily we review a court's ruling concerning the admissibility of expert testimony for an abuse of discretion. *Id.* ¶ 7.  Here, however, following the court's *sua sponte* ruling that the pastor would not be permitted to testify as an expert concerning the theoretical underpinnings of the program that he used with the parents, the father's attorney advised the court,

> Your Honor, I will clarify.  *I'm not asking and I haven't been asking for him to be offered as an expert into [sic] marriage counseling.* . . . I've been trying to get from him . . . what he was asked to do from everybody's perspective, and . . . what they worked on.

(Emphasis added.)  Accordingly, because this contention was not raised before the trial court, our review is for obvious error.  *See Maietta v. Int'l Harvester Co.*, 496 A.2d 286, 294 (Me. 1985) ("[D]efense counsel failed to preserve the objection that is now being pressed.  The difference in testimony does not rise to the level of obvious error affecting substantial rights.").

[¶11]  The parents' pastor testified that he did not have a professional degree in counseling or any college coursework completed in that subject, although he did have related experience working as an "understudy" to another

pastor. On this record, the court did not obviously err in finding that the pastor "lacked the qualifications necessary to offer an opinion" concerning the parents' counseling and limiting the pastor's testimony to a factual recitation of their work together. *Burbank*, 2019 ME 37, ¶ 10, 204 A.3d 851.

D.    Father's Asserted Disability

[¶12]   As evidenced in the court's factual findings, the father's sleep pattern was a significant issue at the hearing. The court took note of the father's physical condition during the hearing several times and found in its judgment that

> [the father's] presentation at trial, which the Court noted on the record from time to time, amply corroborated witness testimony about his disconcerting appearance and behavior whenever he was required to awake before early afternoon. At trial, [the father] did not just appear tired like someone who had worked a night shift. [The father] was barely able to stand at the "All Rise," and had to support himself from falling over. He moved in slow motion. He sat slumped in his chair. His eyes were frequently shut, rolling in his head, or staring vacantly. His own testimony was confused and forgetful. He sometimes shook and trembled while he sat at counsel table. He looked pale and unwell at all times. On the morning of the last day of trial, the Court commented on the record that [the father] looked particularly unwell. [The father's] counsel objected to the Court putting its observation on the record. By afternoon, however, counsel advised the Court on the record that [the father's] mother had taken him to the hospital. The Court finds as a matter of fact, based on the witness testimony and evidence adduced at trial, corroborated by the Court's observations over several days of trial commencing at various times of day, that [the

father's] voluntarily chosen sleep pattern leaves him unable to function on any day in which he is required to wake up before early afternoon.

[¶13]  The father now contends that the court violated the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.S. §§ 12101-12213 (LEXIS through Pub. L. No. 116-72), and the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4551-4634 (2018),[2] in viewing his sleep pattern as a correctable lifestyle choice rather than as a disability requiring accommodation.  Although the father objected at the hearing to the court's comments concerning his in-court presentation, he did not request an accommodation under the ADA or MHRA and thus failed to preserve the issue for appeal.  *See Gallagher v. Penobscot Cmty. Healthcare*, 2019 ME 88, ¶ 6 n.2, 209 A.3d 106; *Newbury v. Virgin*, 2002 ME 119, ¶ 14, 802 A.2d 413; *see also Blackhouse v. Doe*, 2011 ME 86, ¶ 8, 24 A.3d 72 ("An individual with a disability may request special accommodations to ensure an equal opportunity to participate in a court proceeding.").

[¶14]  Even if the father had preserved this argument, the trial court had ample evidence on which to find that his sleep pattern was not a disability, but rather a lifestyle choice.  The neurologist who examined the father and conducted a sleep evaluation testified that the neurologic exam revealed no

---

[2]  The Maine Human Rights Act has since been amended, but those amendments are not relevant to this appeal.  P.L. 2019, ch. 464-465 (effective Sept. 19, 2019).

physical problems; that there was no suggestion of disease or a sleep disorder requiring further investigation; and that if the father chose to do so, his sleep pattern could be gradually changed over the course of "a couple of weeks." Accordingly, the court's factual finding that the father's "unorthodox sleep pattern" was a "choice" and not a disability was not clearly erroneous. *See In re Children of Jessica D.*, 2019 ME 70, ¶ 4, 208 A.3d 363.

The entry is:

> Judgment and order denying relief from the judgment affirmed.

---

Amy McNally, Esq., Woodman Edmands Danylik Austin Smith & Jacques, P.A., Biddeford, for appellant mother

James S. Hewes, Esq., South Portland, for appellant father

Aaron M. Frey, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Biddeford District Court docket number PC-2016-48
For Clerk Reference Only